**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MICHAEL CASHIO** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER 09-00732-DLD** |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY** | **CONSENT CASE** |

## RULING

Plaintiff Michael Cashio seeks judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits (DIB) and supplemental security income (SSI) benefits.

### *Background*

Michael Cashio protectively filed an application for benefits on November 17, 2006, alleging a disability onset date of November 1, 2005, due to a "disabling condition." (TR 83-90). Plaintiff stated in the field disability report that he could not stand or sit for a period of time, bend, stoop, or lift anything due to a fusion in his neck, a lower back injury, and a bulging disc. (TR 98-108) The initial disability determinations each indicated a primary diagnosis of degenerative disc disease of the lumbar spine and a secondary diagnosis of degenerative joint disease of the shoulders. (TR 52, 53)

The applications were denied initially, and a hearing subsequently was held on October 20, 2008, which also resulted in a denial. The plaintiff, his counsel, and a vocational expert appeared and testified at the hearing. (TR 26-51) Plaintiff, who was born on January 31, 1958, was 47 years old at the time of the alleged disability onset date, and

had completed the 10th grade before obtaining a GED. His past relevant work was as an iron worker, AC technician, apartment manger, heavy equipment operator, and guide tour, jobs that were either semi-skilled or skilled and either medium or heavy work.

In denying plaintiff's claims, the Commissioner's administrative law judge ("ALJ") reached the fifth and final step of the five-step sequential disability analysis set forth in 20 C.F.R. § 404.1520(b)-(f) & 416.920(b)-(f).[1] The first two steps involve threshold determinations. The ALJ initially determined that plaintiff had not engaged in substantial gainful employment since his alleged onset date of disability, thereby satisfying the first step in the sequential process. (TR 19) At the second step, the ALJ determined that plaintiff suffered from the following severe impairments: degenerative disc disease of the cervical spine, bilateral shoulder degenerative joint disease and degenerative disc disease of the lumbar spine. (TR 19)

At step three of the process, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or were medically equivalent to the criteria of one of the listed impairments set forth in the Commissioner's regulations at 20 C.F.R. pt. 404, subpt. P, Appendix 1. (TR 21) The ALJ then determined that plaintiff had a functional capacity[2] ("RFC") to perform a modified range of light work, with the preclusion of overhead work.[3]

---

[1] *See, e.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).

[2] Residual functional capacity ("RFC") is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), *citing* SSR 96-8p.

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 CFR 404.1567

At step four of the sequential process, the ALJ determined that plaintiff was unable to return to his past relevant work. (TR 34)  The burden then shifted to the Commissioner at step five of the process to show that plaintiff could perform significant numbers of jobs existing in the national economy, consistent with plaintiff's medical impairments, age, education, past work experience (if any), and RFC.  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001).  Based upon the substantial evidence in the record, including the testimony of a vocational expert during the administrative hearing, and relying on the medical-vocational guidelines as a framework for decision, the ALJ determined that plaintiff was able to perform a significant number of jobs in the national economy, including positions such as motel cleaner, mail clerk, and delivery driver.  (TR 24) In doing so, the ALJ rejected the opinion testimony of plaintiff's treating physician, Dr. Barrow.  The ALJ therefore concluded that plaintiff was not disabled for purposes of the Social Security Act.  (TR 24)

### *Governing Law*

In reviewing the Commissioner's decision to deny disability and SSI benefits, the Court is limited to a determination of whether the Commissioner's decision was supported by substantial evidence existing in the record as a whole and whether the Commissioner applied the proper legal standards.  *E.g., Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  In applying the "substantial evidence" standard, the Court must carefully scrutinize the record to determine if, in fact, substantial evidence supporting the decision does exist, but the Court may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute its judgment for the Commissioner's even if the evidence preponderates against the Commissioner's decision.  *Id.*  Substantial evidence means more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might

3

accept to support a conclusion. *Id.* A finding of "no substantial evidence" will be made only where there is a conspicuous absence of credible choices or an absence of medical evidence contrary to the claimant's position. *Id.* In order for the Court to find there is "no substantial evidence" supporting the ALJ's conclusions, this court "must conclude that there is a 'conspicuous absence of credible choices' ..." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir.1983) (*citing Hemphill v. Weinberger*, 484 F.2d 1137 (5th Cir.1973)).

The overall burden of proving disability under the Social Security Act rests on the claimant. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). If a claimant proves that he no longer is able to work in his prior job, then the burden shifts to the Commissioner to show that there is some other type of substantial gainful activity that the claimant can perform. *Id.* Thus, in cases such as this one where the Commissioner determines that the claimant cannot perform hos past relevant work and accordingly reaches the fifth step of the five-step disability sequential analysis, the Commissioner bears the burden of establishing that there is other work in the economy that the claimant can perform. *Perez v. Schweiker*, 653 F.2d 997, 999-1000 (5th Cir. 1981). If the Commissioner adequately points to potential alternative employment, the ultimate burden of persuasion then returns to the claimant to prove his inability to perform those jobs. *Kraemer v. Sullivan*, 885 F.2d 206 (5th Cir. 1989); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fruge v. Harris*, 631 F.2d 1244, 1246 (5th Cir. 1980).

### *Statement of Errors*

In his present appeal, plaintiff alleges the following grounds for reversal of the Commissioner's decision: (1) the ALJ rejected the medical source statement opinion of

treating physician Barrow without showing good cause under SSR 96-2p and SSR 96-8p; and (2) the RFC finding of light work limited by the inability to perform overhead work is not supported by substantial evidence.

## *Discussion and Analysis*

The issue before this Court is whether the Commissioner's finding that Michael Cashio is not disabled is supported by the substantial evidence and was reached by applying the proper legal standards. 42 U.S.C. § 405(g).

## *Issue 1: Rejection of treating physician's medical source statement opinion.*

## *Medical History*

The medical records in this case span a period of 12 years, consisting mostly of quarterly visits to plaintiff's treating physician, Dr. Barrow. Plaintiff began treating with Dr. Barrow on October 14, 1996, in connection with an automobile accident on May 8, 1995, in which plaintiff's vehicle was rear-ended. Dr. Barrow opined that recent cervical spine MRI showed "old, calcified, tiny, central C3-C4 herniation" with "no significant change from the study on 7/16/90." Dr. Barrow was unsure why plaintiff was suffering so much pain as he had recently undergone a C3-C4 fusion. Plaintiff reported that pain pills, muscle relaxers and heat decreased his symptoms, and made no complaints regarding side-effects of his various medications. (TR 145-147) Dr. Barrow's records through 1997 indicate that plaintiff was sleeping well, functioning well, had no side-effects from the medications, felt the medications helped with the pain, and felt the best he had in years. (TR 141-144, TR 190-193)

The records next pick up with a July 30, 2003, visit to Dr. Barrow regarding pain from a work-related injury in October, 2002. The July 2003 lumbar spine MRI revealed

"disc bulging and desiccation of the disc from L2-3 through L5-S1 with significant bilateral neuroforaminal stenosis," but plaintiff's deep tendon reflexes were symmetric and non-pathologic, and there was no focal lower extremity motor or sensory deficits. Dr. Barrow recommended a 3-shot series of epidural steroid injections, and sent plaintiff to Dr. Isaza for a surgical opinion. (TR 156) In August, 2003, plaintiff complained that his medications were helping him, but it was becoming difficult to drive secondary to the medications. Dr. Barrow made no additional recommendations as to plaintiff's treatment. (TR 155) While plaintiff's pain medication was increased in September 2003, Dr. Barrow's examination of plaintiff continued to reveal no lower extremity neurological deficits, although he had some positive neural tension signs along with tenderness in the lumbar region. Dr. Barrow recommended physical therapy and the epidural steroid injections, and Dr. Isaza recommended a lumbar myelogram. Plaintiff reported that his medication "really helps him sleep at night." (TR 153)

In April 2004, plaintiff returned to Dr. Barrow, who found that plaintiff's paraspinal muscles were very tense with palpable trigger points and a "moderately restricted range of motion in all planes." The examination also revealed a positive slump test bilaterally, positive neural tension signs bilaterally, and an equivocal Femoral stretch bilaterally. However, the deep tendon reflexes were non-pathologic and there were no focal motor deficits or muscle atrophy. Plaintiff reported no side-effects from his medications, and continued to receive medication to relieve his anxiety and pain. (TR 151)

In May 2004, Dr. Barrow's notes reflect that plaintiff had a functional capacity evaluation a few weeks earlier. Although that evaluation is not part of the medical evidence, Dr. Barrow reported that the plaintiff was found to be functioning at a sedentary

work capacity, and the evaluator had recommended a specific manual physical therapy program, a specific home exercise regimen, and then consideration for vocational rehabilitation. The myelogram recommended by Dr. Isaza had revealed multi-level disc bulging and a slight retrolisthesis at L3-4 as well as some facet arthritis at l3-4, L4-5, and L5-S1; however, Dr. Isaza did not recommend surgical intervention. Plaintiff reported that he did not want the epidural steroid injections, and that as long as he was taking his medications, he was able to function with regard to the activities of daily living. (TR 149)

Between August 2004 and December 2004, plaintiff received the epidural steroid injections, and reported he had no problems with his pain medications, and that these medications allowed him to function with regard to his activities of daily living. Dr. Barrow described plaintiff as having less pain behavior, no muscle atrophy or motor deficits, and normal deep tendon reflexes. Plaintiff also reported that aquatic therapy was benefitting him, and Dr. Barrow advised him to continue with that therapy. (TR 158-162) Plaintiff twisted his back getting out of his vehicle in January 2006, and was treated in the emergency room with 100 mg Demerol and 50 mg Phenergen. (TR 166-180)Through August 2006, plaintiff's neck and back pain were reported as stable with intact sensation, with some decreased range of motion in the cervical and lumbar spine. Plaintiff reported that since October 25, 2005, he was experiencing "good sleep" due to a Lunesta prescription, and there were no reports of side-effects from any of the medications. (TR 180-183)

The records resume in January 2007, when Dr. Lyons, the agency physician, performed a physical examination of plaintiff, and noted that there was a significant range of motion deficits in his neck, L-spine, shoulders and hips. Dr. Lyons also noted that the

7

straight leg raise was negative, reflexes were normal, and sensations were intact. While plaintiff complained that all his joints hurt, the examination revealed no indication of tenderness, redness, warmth, or areas of effusions on any of the joints of which plaintiff complained. Dr. Lyons further noted "questionable cooperativity" from plaintiff on some aspects of the exam. (TR 217-220)

Following the physical examination by Dr. Lyons, plaintiff underwent a Residual Functioning Capacity ("RFC") exam on February 1, 2007, which included a primary diagnosis of lumbar degenerative disc disease and a secondary diagnosis of status post-cervical anterior fusion. The limitations established by the RFC were:1) occasional lifting or carrying 20 pounds; 2) frequently lifting and carrying 10 pounds; 3) standing or walking for about 6 hours in an 8-hour workday, with normal breaks; 4) sitting about 6 hours in an 8-hour workday, with normal breaks; 5) unlimited pushing and/or pulling; and 6) some postural limitations.[4] (TR 223-230) The examiner also noted the October 25, 2005, diagnosis of bilateral shoulder degenerative joint disease, and the visit to the ER, as well as the examination of August 7, 2006 which showed a full range of motion of both shoulders but decreased lumbar flexion and extension, and decreased sensation of the left index fingers. Plaintiff self-reported no limitations in his ability to perform his own personal grooming, to prepare his own meals, and to place clothes in the washer and dryer once in a while. Plaintiff reported that he could drive but did not do it often because of pain and his medications. The examiner found his statements to be "partially credible in that the

---

[4] 20 CFR §404.1567, defines the physical exertion requirements of light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

claimant does have evidence of a neck and back impairment that may limit him from heavier lifting; however, the plaintiff was noted to have FROM [full range of motion] of his shoulders in 08/06, and the evaluator opined that the plaintiff should be able to do light tasks which is more than was reported on ADL form [Activities of Daily Living form]." (TR 228)[5] Two weeks later, plaintiff returned to Dr. Barrow's office. Plaintiff did not report any side effects from the medications, and his medications were not adjusted.

On May 24, 2007, Dr. Barrow stated that plaintiff's sensations were intact, but his range of motion in the cervical and lumbar regions had decreased. Plaintiff did not report any side-effects from his medications, and there were no adjustments made to his medications. At this visit, Dr. Barrow prepared a letter on behalf of plaintiff which stated that the plaintiff has been unable to return to his previous occupation since the motor vehicle accident of May 5, 1995, and that secondary to his severe chronic medical conditions and chronic narcotic pain medications, "he is considered permanently and totally disabled." (TR 246) In August 2007, plaintiff complained of stomach upset, but his medication dosages were not adjusted, although Dr. Barrow prescribed medication for the upset stomach. Two days after the August 2007 visit, plaintiff requested a change in medication, and reported to Dr. Barrow in November 2007 that the new pain medication "works well" and his tolerance of the drug was "good." He also reported he did not need

---

[5] On February 2, 2007, plaintiff also underwent a mental evaluation, using the Psychiatric Review Technique form, which found that plaintiff had no medically determinable mental impairments, and thus, no functional limitations. (TR 231-243) The court notes, however, that the ALJ mistakenly opined that the plaintiff had mild functional limitations (TR 20), which, while in conflict with the medical evidence, is a harmless error as the ALJ's determination as to plaintiff's functional limitations due to depression still falls short of the severity criteria regarding mental disorders. 20 CFR 404.1520a(d)(1) and 416.920a(d)(1).

the anti-anxiety medication as much, and there were no reported side effects from the medications   (TR 256)

In February 2008, Dr. Barrow noted plaintiff's chronic back pain but made no changes to his medications.  He did, however, recommend an increase in plaintiff's activity levels.  Plaintiff did not report any side effects from the medications.  Plaintiff's straight leg raise and Patrick's tests were both negative.

In May 2008, plaintiff returned to Dr. Barrow, who continued the same medication dosages.  Plaintiff's straight leg raise test was again negative, and his range of motion in his cervical and lumbar spine was decreased.  It was at this visit that Dr. Barrow prepared a Physical Residual Functional Capacity Questionnaire on behalf of plaintiff, and for the first time, reported that plaintiff suffered drowsiness and nausea as a side-effect of his medications. Dr. Barrow also reported that the plaintiff suffered from depression, and that his pain or other symptoms were severe enough to constantly interfere with the attention and concentration needed to perform simple work tasks.  Further, Dr. Barrow determined that plaintiff was incapable of even "low stress" jobs due to his stress and increased pain. Dr. Barrow opined that plaintiff could stand for only 5-10 minutes, and could sit and stand/walk less than 2 hours in an 8-hour workday, and he would need to walk 10 minutes every 5-10 minutes in an 8-hour day.  Dr. Barrow also opined that plaintiff could grasp, turn/twist objects, and use fine manipulation only 50% of the time, and his reaching ability was limited to 1% out of an 8-hour workday.  (TR 248-251).

The last medical evidence in the record is a marginal note regarding an August 12, 2008, telephone call from plaintiff to Dr. Barrow's office, which indicated that plaintiff's depression had increased, with "separation" written underneath this notation. This marginal

note is written in the margins of the record regarding the February 12, 2008, visit, and seems to reference a prescription for Pristiq, an anti-depressant. (TR 273) It is at this point that the records fall silent.

### *Dr. Barrow's Opinion Evidence*

In his decision, the ALJ outlined Dr. Barrow's opinion evidence (the May, 2008 RFC), but he stated that he did not accept this opinion as he found that the objective medical evidence provided by Dr. Barrow did not "substantiate such limitations" as the ones listed by Dr. Barrow in the May, 2008 RFC. (TR 23)

In this appeal, plaintiff argues that under 20 C.F.R. § 404.1527(d)(2) and SSR 96-2p, the ALJ has a duty to specifically state in his decision the weight he gives to a treating physician's opinion, and must show good cause when giving that opinion little or no weight. Plaintiff contends that the ALJ's determination that the objective medical evidence provided by Dr. Barrow did not substantiate the limitations set forth in Dr. Barrow's May 2008 RFC is not supported by substantial evidence in that the progress notes repeatedly indicate that plaintiff suffered from back, neck, and shoulder pain, decreased sensation, and a positive straight leg raise test, along with decreased range of motion. Plaintiff argues that these findings support Dr. Barrow's limitation regarding plaintiff's ability to lift, stand, walk, sit, or move his neck. Additionally, plaintiff argues that the consulting examiner's findings further support the limitations found in Dr. Barrow's RFC. (rec. doc. 22)

In response, the Commissioner contends that the objective medical evidence does not support Dr. Barrow's limitation in that Dr. Barrow's treatment consisted almost entirely of the administration of pain medication; plaintiff was not referred to an orthopedist or neurologist for treatment; there were no work restrictions until the May 2008 RFC; and

plaintiff was advised to increase his activity levels as recently as February 2008. The Commissioner also states that the consultative examiner found that the plaintiff maintained full grip strength, full strength in both the upper and lower extremities, and intact sensation. The plaintiff's straight leg raise test was negative bilaterally in the supine and sitting position; he required no assistive devices to ambulate; could independently dress and undress himself, and he could walk on his heels and toes with minimal difficulty. (rec. doc. 24)

***Governing Law on Treating Physicians' Opinions***

In the Fifth Circuit, the opinions, diagnoses, and medical evidence of treating physicians who are familiar with a plaintiff's condition should be accorded considerable weight in determining disability. *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000). An ALJ may give less weight to a treating physician's opinion only when there is good cause shown to the contrary. *Id.* Good cause includes instances where the physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or otherwise unsupported by the record. *Hospital Service District No. 1 Of The Parish Of LaFourche v. Thompson*, 2004 WL 192047, *3 (E.D. La. Aug. 25, 2004). Also, the general rule is that a treating physician's opinion on the nature and severity of a claimant's impairments will be given "controlling weight" only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If the treating physician's opinion is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic tests or otherwise unsupported by the evidence, the ALJ has good cause for discounting the treating physician's opinion in favor of other experts not giving

the opinion considerable weight. *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001). *Newton,* 209 F.3d at 456 (citing *Brown v. Apfel*, 192 F.3d 492,500 (5th Cir. 1999). However, even if an ALJ finds that a treating physician's medical opinion is not entitled to controlling weight, "that does not mean that the opinion can be rejected." *Albert v. Barnhart*, 2004 WL 385055, *5 (E.D. La. Feb. 26, 2004). Instead, treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527(d)(2) and 416.927. *Id*., citing Social Security Regulation 92-2p. The factors set forth in those regulations consist of the following: (1) examining relationship; (2) treatment relationship, length of treatment, frequency of examination, nature and extent of relationship; (3) supportability; (4) consistency; and (5) specialization. *Albert*, at *5. However, while the opinion and diagnosis of a treating physicain should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining the claimant's disability status. *Newton*, at 455; Social Security Act § 223(d)(1)(A), as amended, 42 U.S.C.A. § 423(d)(1)(A). Thus, the ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds.*

An independent review by this court of the medical evidence and the ALJ's determination reflects that when the ALJ failed to accept Dr. Barrow's RFC, he weighed that opinion under the five factors, albeit briefly. For example, the ALJ discussed the length of plaintiff's treatment with Dr. Barrow, noted that plaintiff has been Dr. Barrow's patient since 1996, and saw Dr. Barrow approximately every 3 months for pain management. The ALJ properly noted that Dr. Barrow is a board-certified physical medicine and rehabilitation physician, but that Dr. Barrow's records reflect no suggestion

that the plaintiff should lie down 2/3 to 3/4 of the day, which is how plaintiff testified at the hearing he spent the majority of his day. The ALJ correctly noted that Dr. Barrow recommended that plaintiff increase his activity level.

In its review of the medical evidence, the ALJ's determination, and Dr. Barrow's suggested RFC, the court notes that the objective medical evidence in this case reflects that plaintiff complained about nausea on one occasion, and reported some difficulty in driving early in the medical history. Other than these two notations, the record is consistent that plaintiff did not complain about side-effects from medication. Moreover, the medical evidence, consisting of Dr. Barrow's own records and those of the consulting examiner, reflect that plaintiff's pain was managed by the medications, and at times, managed well. Dr. Barrow did not place any limitations on plaintiff's activities from 1996 forward, until the day the RFC was prepared. Thus, the ALJ considered the consistency of Dr. Barrow's RFC with the record as a whole, and rejected Dr. Barrow's RFC in favor of the agency's RFC. In the final analysis, conflicts in the medical evidence are to be resolved by the Commissioner, not by the courts. *E.g.,Oldham v.,Schweiker*, 660 F. 2d 1078, 1084 (5th Cir. 1981).

Also, the ALJ has the sole responsibility for determining a claimant's disability status, and under 20 C.F.R. 416.927(d), the ALJ does not have to discuss each factor when there is competing medical evidence from an examining physician, as was the case here by the consultative examiner. The Fifth Circuit has determined that "only absent reliable medical evidence from a treating or examining physician that controverts the claimant's treating specialty will an ALJ be required to perform a detailed analysis of the treating physician's views." *Newton*, at 456. In this case, because there is other reliable

evidence in the form of the consultative examination, the agency's RFC, and Dr. Barrow's own medical records, such a detailed analysis is not required. The ALJ, however, did conduct an analysis, and clearly showed good cause for his decision to reject Dr. Barrow's RFC of May 2008. Moreover, his reasons were supported by substantial evidence.

*Issue 2: The ALJ's RFC is unsupported by substantial evidence.*

Plaintiff next argues that the ALJ did not point to anything in the record to support the RFC finding of light work, precluded only by the inability to perform overhead work. Plaintiff asserts that the ALJ considered only the objective findings from the medical reports, and failed to analyze the medical sources' opinions, thereby improperly substituting his own lay opinion for that of a doctor.

In response, the Commissioner asserts that the ALJ considered the record as a whole, and points to the January 17, 2007, consultative examination which detailed plaintiff's limitations, and plaintiff's "questionable cooperativity" throughout some aspects of the physical exam." (TR 217-20). Further, in the February 2, 2007 physical RFC (TR 223-30), the examiner evaluated the medical records, and opined that the plaintiff's statements regarding his limitations were only partially credible, as the examiner found plaintiff had full range of motion in his shoulders, and thus could perform tasks at the light exertional level. The Commissioner also correctly states that the sole responsibility for evaluating the plaintiff's RFC based on the record as a whole belongs to the Commissioner. *Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990); 20 C.F.R. § 404.1546.

As explained earlier, the ALJ analyzed the record as whole, including the medical opinions, in deciding the plaintiff's RFC. He discussed the findings of Dr. Lyons, and the

15

plaintiff's testimony as to the extent of his abilities due to his pain. For example, as discussed, the consultative examiner found plaintiff's cooperativity to be questionable, and the RFC examiner found plaintiff's statements only partially credible, statements which were duly noted by the ALJ in his decision. As another example, at the hearing of October 20, 2008, plaintiff testified that he was in pain constantly, and did not perform any housework, but drove his car 3-4 times a week to visit a friend or pick up the children. He testified that his memory was affected by his medication, he was "very depressed," and had left his wife. (TR 43). Lastly, he testified that Dr. Barrow had not suggested any kind of vocational rehabilitation for him, but that he tried to perform exercises for his back. (TR 39-40) This testimony is at odds with his reports to Dr. Barrow that the pain medications helped, and that he was able to function in the activities of daily living as long as he had his pain medications. The plaintiff did not complain to Dr. Barrow that the medications made him drowsy and unable to function. Thus, plaintiff's testimony and Dr. Barrow's records are in conflict with Dr. Barrow's opinion, and it was well within the ALJ's discretion to resolve these conflicts. While the ALJ's discussion of the RFC was brief, to the extent that Social Security Ruling 96-8p might require more articulation in this case regarding assessment of plaintiff's RFC, any error by the ALJ would at best be harmless,[6] as it is clear that the ALJ considered plaintiff's impairments when he precluded overhead work in the light work RFC. Moreover, as a general matter, the ALJ is not required to specifically

---

[6] In *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994), the Fifth Circuit stated in *dicta* that "[n]o jurisprudential authority for the application of a 'harmless error' analysis [in social security disability cases] is cited, and we are aware of none." 36 F.3d at 438. The Court would note that Fifth Circuit social security disability cases prior to *Bowling* have utilized a "harmless error" analysis. *See Morris v. Bowen*, 864 F.2d 333, 334-336 (5th Cir. 1988); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *see also Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989). This earlier circuit precedent on the issue is controlling under the Fifth Circuit's rule on resolution of intra-circuit conflicts. *E.g.*, *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 n.7 (5th Cir. 1997).

explain each piece of evidence that he accepts or rejects.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).

Based on a review of the record , the court finds that the ALJ's decision is supported by substantial evidence, and the decision of the Commissioner denying supplemental security income benefits ("SSI") and disability insurance benefits ("DIB") to Michael Cashio is **AFFIRMED** and  plaintiff's complaint is **DISMISSED** with prejudice.

Signed in Baton Rouge, Louisiana, on February 16, 2011.

	**MAGISTRATE JUDGE DOCIA L. DALBY**